UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| KEITH ALLEN BALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 2:21-cv-00062-JMS-MJD |
| | ) |
| JOHN PLASSE Sheriff, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Keith Ball was a pretrial detainee in the Vigo County Jail from May 2020 to May 2022 during the COVID-19 pandemic. He filed this civil rights suit alleging that he was subjected to unconstitutional conditions of confinement while incarcerated at the jail that caused him to contract the virus. The defendant, Vigo County Sheriff John Plasse, has filed a motion for summary judgment. Dkt. 26. For the reasons below, that motion is **granted** as to Sheriff Plasse in his individual capacity but **denied** as to claims against him in his official capacity.

## I.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because the defendant has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. Precautionary Measures for COVID-19 at the Jail

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[1] The Vigo County Jail undertook health precautions at the direction and recommendation of the Vigo County Department of Health.[2] Dkt. 26-2 at ¶ 17. Jail Commander Charles Funk and Jail Matron Casey Lee were responsible for the day-to-day operations at the jail. *Id.* at ¶¶ 3−4, 6.

Inmates booked into the jail were quarantined for two weeks beginning in March 2020. *Id.* at ¶ 7.

The jail issued masks to inmates attending court hearings in June 2020. *Id.* at ¶ 8. Jail staff began wearing masks in August 2020. *Id.* at ¶ 9. Masks were given to inmates who were in quarantine, leaving general population, moving around the facility, and in common areas in November 2020. *Id.* at ¶ 11.

In December 2020, an inmate who died following a medical episode tested positive for COVID-19. Dkt. 26-3 at ¶ 12. The Indiana Department of Health ordered that all of the inmates in the jail be tested following his death, and over 100 inmates, including Mr. Ball, tested positive. *Id.* at ¶¶ 14−15. After this COVID-19 outbreak, all inmates were required to wear masks. *Id.* at ¶ 13. Mr. Ball testified that he did not have access to a mask before the inmate's death. Dkt. 26-1 at 24.

After the outbreak, the Indiana Department of Health instructed the jail to be locked down. Dkt. 26-3 at ¶ 18. Inmates who tested positive were placed in separate cellblocks and quarantined for two weeks. *Id.* at ¶ 17. During the lockdown, inmates were allowed out of their cells for one hour each day to shower and speak with family by phone or through the kiosk. *Id.* at ¶ 19. The

---

[1] *See* Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 13, 2022).

[2] Mr. Ball disputes that the precautions taken before and after the outbreak were done at the direction and recommendation of the Vigo County Board of Health. Dkt. 63 at 6, ¶ 29. However, he provides no evidence to create a material dispute of this fact.

jail's medical department spoke to inmates in groups about what a positive COVID-19 test meant and what signs and symptoms to look for. *Id.* at ¶¶ 20−21. Jail officers were instructed to contact the medical department if any inmate complained of COVID-19 symptoms. *Id.* at ¶ 24.

Inmates are provided with cleaning supplies each day, which include a mop, a mop bucket with a cleaning solution with disinfectant, dust mop, toilet brush, spray bottle, and rags. Dkt. 26-4 at ¶¶ 17−20. Trustees began disinfecting hard surfaces and holding cells in March 2020. *Id.* at ¶ 21. More cleaning materials were provided after the December 2020 outbreak. *Id.* at ¶ 22.

COVID-19 tests were not available at the jail until December 2020, when they were provided by the Health Department. Dkt. 26-2 at ¶¶ 17, 19. COVID-19 vaccines were not available in December 2020, but they are now offered to all incoming inmates. *Id.* at ¶¶ 20, 22.

### B. Mr. Ball's Illness and Claims

Mr. Ball felt sick in the second and third week of November 2020. Dkt. 24-1 at 13. He had headaches, body shivers, and was constantly cold. *Id.* at 13−14. Mr. Ball was seen by a nurse, who told him that he did not have COVID-19 and that his symptoms were due to the changing seasons. *Id.* at 13. Mr. Ball asked the nurse for a COVID-19 test, and she told him, "We don't offer tests to people incarcerated. Seek it upon your release." *Id.* at 15, 24.

Mr. Ball tested positive for COVID-19 during the December 2020 COVID-19 outbreak. *Id.* at 34. After his positive test, Mr. Ball had diarrhea for six days. *Id.* at 16. He had headaches twice a week from November 2020 through January 2021, and no sense of taste or smell from November 2020 through March 2021. *Id.* He also suffered from partial hearing loss in his right ear and constant arm tingling. *Id.* at 15, 21−22. Mr. Ball was seen by jail nurses and a doctor for his hearing loss, who treated him by flushing out his ears and providing ear drops. *Id.* at 17−18.

Mr. Ball testified that he sued Sheriff Plasse because he thinks he is responsible for poor

4

jail conditions that resulted in him contracting COVID-19. *Id.* at 24. Specifically, he believes the Sheriff is responsible for overcrowding, failing to procure COVID-19 tests, failing to provide adequate cleaning supplies and soap, and failing to provide inmates with masks until after an inmate died from the virus. *Id.* Mr. Ball also testified that certain safety precautions were handled poorly. *Id.* For instance, although Mr. Ball was quarantined upon his arrival for two weeks, he said that newly arriving inmates were allowed to interact with the other inmates on quarantine, meaning the inmates who were released from quarantine on their fifteenth day may have been exposed to inmates with the virus who were just being booked into the jail. *Id.* at 25−26. Mr. Ball testified that inmates did not receive rags or brushes to clean with, and sometimes the jail staff would provide a bucket with water and no cleaning solution until the inmates complained. *Id.* at 27−28. Other times, inmates would use their own clothing to wipe down surfaces because they were informed there were no rags to distribute. *Id.* at 29.

 Mr. Ball said that from December 2020 until December 2021, inmates received cloth masks on a weekly basis that they would have to reuse. For about three weeks in December 2021, inmates were provided N-95 masks, but then the jail commander collected them and changed the policy back to distributing cloth masks. *Id.* at 33−34.

 Mr. Ball was transferred to the Martin County Jail in early 2022 due to overcrowding. *Id.* at 7. Mr. Ball testified that he "definitely" saw a difference in COVID-19 precautions because the other jail had Lysol spray and wipes, bleach, and enough cleaning rags for everyone. *Id.* at 39.

 Mr. Ball does not dispute that the Vigo County Jail implemented more effective protective measures to protect inmates at the jail after the December 2020 COVID-19 outbreak. Dkt. 63 at 6, ¶ 29.

## III.
## Discussion

Mr. Ball argues that Sheriff Plasse subjected him to unconstitutional conditions of confinement with respect to COVID-19 precautions, resulting in him contracting the illness. Sheriff Plasse argues that he is entitled to summary judgment because (1) he did not violate Mr. Ball's Fourteenth Amendment rights, and regardless he is entitled to qualified immunity, and (2) the Sheriff's Department did not have a policy, custom, or practice that caused the violation of Mr. Ball's Fourteenth Amendment rights.

### A. Individual Liability

Conditions-of-confinement claims for pretrial detainees, which are derived from the Due Process Clause of the Fourteenth Amendment, are analyzed under an objective standard. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). Under this standard, the plaintiff must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the [defendant's] response was objectively unreasonable under the circumstances; and that [he] acted purposely, knowingly, or recklessly with respect to the consequences of [his] actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda v. County of Lake*, 900 F.3d 335, 353−54 (7th Cir. 2018)).

A reasonable jury could find that the COVID-19 virus created a serious risk of harm to Mr. Ball's health, and that the general risk of exposure was exacerbated by the close quarters that he was subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must decide if Sheriff Plasse responded reasonably to the pandemic or was reckless with the precautions he implemented. Sheriff Plasse argues that he was not reckless

because he could not provide COVID-19 tests that he did not have and that the other conditions Mr. Ball complains of—lack of masks, overcrowded dorms, and inadequate cleaning supplies— were not conditions that amounted to punishment. Dkt. 27 at 9. Sheriff Plasse also alleges that he was not reckless with respect to Mr. Ball's serious medical needs because Mr. Ball was seen by a nurse for his COVID-19 symptoms and by jail nurses and a doctor for his hearing loss.[3]

The Court declines to determine whether a jury could conclude that Sheriff Plasse's response was objectively unreasonable because it concludes that he is entitled to qualified immunity.

"Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)).

The Court finds the second element dispositive. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing

---

[3] "Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). There is no evidence of Sheriff Plasse's personal involvement in the allegations here: Sheriff Plasse does not personally provide medical care at the jail or oversee day-to-day operations of the jail. Because he does not argue that he is entitled to summary judgment due to lack of personal involvement, the Court addresses his other arguments. *Mwangangi v. Nielsen, et al.*, 48 F.4th 816, 829 (7th Cir. 2022).

violates that right. . . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11−12 (2015) (cleaned up). Courts cannot define "clearly established law at a high level of generality" but rather must assess "whether the violative nature of *particular* conduct is clearly established." *Id.* (cleaned up). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

It is clearly established that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment, *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and that the right to safe conditions extends to pretrial detainees under the Fourteenth Amendment, *Hardeman*, 933 F.3d at 821−22. And although COVID-19 was a new virus, the duty to protect inmates from needless exposure to a serious illness "need not be litigated and then established disease by disease [.]" *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

But the issue is whether Sheriff Plasse was on notice that his particular conduct—placing detainees in overcrowded cells, failing to provide adequate cleaning supplies, failing to implement a universal mask rule before the December 2020 COVID-19 outbreak, and failing to procure COVID-19 tests—violated Mr. Ball's Fourteenth Amendment rights. Mr. Ball has cited no case that suggests as much,[4] and the Court can find none. Instead, many courts have granted qualified immunity to jail and prison administrators given the evolving nature of the virus and the related

---

[4] Mr. Ball cites to *Maney v. Brown*, Case No. 6:20-cv-00570-SB, 2020 WL 7364977, *5−6 (D. Ore. Dec. 15, 2020), in which the court held that the defendants were not entitled to qualified immunity because "the law is clearly established that individuals in government custody have a constitutional right to be protected against a heightened exposure to serious, easily communicable diseases, and the Court finds that this clearly established right extends to protection from COVID-19." Although this Court agrees that this holding describes the legal standard at a "high level of generality," that is insufficient for a qualified immunity analysis. *Mullenix*, 577 U.S. at 11−12. Rather, the Court must find a case that describes similar *conduct* that Mr. Ball complains about here.

recommendations for keeping incarcerated individuals safe. *See, e.g., Jones v. Burt*, Case No. 1:21-cv-41, 2022 WL 4244298, *5 (W.D. Mich. July 15, 2022) (granting qualified immunity on claim related to failure to social distance because "[n]o court has found that the inability of prison officials to ensure social distancing occurs during the COVID-19 pandemic, standing by itself, and in light of other measures . . . such as . . . setting up isolation areas for known COVID-positive prisoners, violates the Eighth Amendment."); *Ross v. Russell*, Case No. 7:20-cv-000774, 2022 WL 767093, *14 (W.D. Va., Mar. 14, 2022) (finding jail officials were entitled to qualified immunity because, given the ongoing and changing guidance from health officials as to a novel virus, "neither the policies or occasional lapses [in enforcing the policies] were clearly insufficient to protect prisoners").

Qualified immunity is especially appropriate because Sheriff Plasse is a correctional professional, not a health professional. The undisputed evidence is that the COVID-19 protective measures implemented at the jail were at the recommendation of the Vigo County Health Department. Dkt. 26-2 at ¶ 17. Courts have "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff," and therefore it was reasonable for Sheriff Plasse to defer to the health department for guidance on handling COVID-19 within the jail. *McGee*, 55 F.4th at 569, 573 (cleaned up) (upholding grant of qualified immunity for jail officials in medical care context because Seventh Circuit precedent "dictates that corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment"); *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (holding that plaintiff could not prove the subjective element of deliberate indifference claim "because the

defendants are all non-medical officials who reasonably relied on the judgment of medical professionals").

Accordingly, summary judgment is **granted** as to Sheriff Plasse in his individual capacity.

### B. Practice-or-Policy Claim

The Court now turns to whether Sheriff Plasse is entitled to summary judgment in his official capacity. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("Indiana Code § 36-2-13-5(a) provides without further qualification that it is the sheriff's duty to take care of the jail and its prisoners. Thus, . . . the sheriff serves as the county's official decision-maker in matters involving the county jail.").

In order to maintain a § 1983 claim against Sheriff Plasse in his official capacity, Mr. Ball must show that his constitutional rights were violated by a policy or custom of the Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Ball must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that he is challenging a facially lawful policy (express or implied), he must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If he is challenging an unconstitutional municipal practice or custom, he must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

### i. Deprivation of a Constitutional Right

Although Fourteenth Amendment claims against individuals are analyzed under an objective standard, *Hardeman*, 933 at 821−22, *Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference, *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). As the Supreme Court has explained,

> [Q]uite apart from the state of mind required to establish the underlying constitutional violation . . . a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.

*Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997); *see also Miranda v. County of Lake*, 900 F.3d 335, 345, 352 (7th Cir. 2018) (applying deliberate indifference standard to pretrial detainee's *Monell* claim despite disavowing that standard for pretrial detainee's claims against individual defendants).

Thus, the Court analyzes Mr. Ball's claim under the deliberate indifference standard. Under that standard, Mr. Ball must show that he was at serious risk of exposure to harm, and the Sheriff "kn[ew] of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). The fact that Mr. Ball contracted COVID-19 is not enough to show deliberate indifference because the sheriff can avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Again, a reasonable jury could find that COVID-19 created a serious risk of harm to Mr. Ball's health, satisfying the first prong of the deliberate indifference analysis. *Wilson*, 961 F.3d at 840. Thus, the Court must determine whether there is a dispute of fact as to whether the Sheriff's

policies related to COVID-19—or lack thereof—evinced deliberate indifference. The Court concludes there is.

First, a jury could find that Sheriff Plasse was deliberately indifferent by failing to create a comprehensive written policy to combat the spread of COVID-19 in the jail. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that a medical services provider could be liable for failing to establish a protocol for the coordinated care of chronic illnesses because the need for such a protocol was "obvious," so a jury could find that the lack of protocol caused the plaintiff's death. While the Court recognizes that the evolving nature of the COVID-19 virus and guidance provided by the CDC would warrant a flexible approach, a jury could find that the lack of a written policy resulted in a haphazard response in the jail.

To the extent that the Sheriff's Department had a policy to combat COVID-19, a jury could conclude that the few steps taken were so ineffectual as to evince deliberate indifference. In an overcrowded facility, no efforts were made to socially distance inmates.[5] There was no evidence that inmates were provided educational materials about COVID-19. Sheriff Plasse does not explain why jail staff members were not required to wear masks until August 2020, or why inmates were not instructed to wear masks before December 2020. There was no evidence that staff members were screened for symptoms upon entry into the jail. A jury could find that the few policies enacted—increased cleaning and quarantining incoming inmates—were insufficient in light of the serious risks posed by COVID-19 and other reasonable measures that could have been taken. *See*

---

[5] The Court recognizes that deference must be afforded to jail administrators in matters implicating safety and security concerns, including decisions related to inmate housing. *Mays v. Dart*, 974 F.3d 810, 820, 824 (7th Cir. 2020) (vacating portion of preliminary injunction that precluded Cook County Sheriff from double-celling inmates during COVID-19 because housing decisions implicated security concerns while upholding provisions regarding masks, sanitation, and testing). Here, though, the Sheriff provided no evidence related to social distancing efforts.

*Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (upholding grant of preliminary injunction where officials at immigration detention center failed to provide detainees masks or compel guards to wear masks, failed to enact social distancing measures, and failed to provide sufficient soap or hand sanitizer).

Many courts have granted summary judgment in favor of municipalities for their responses to the COVID-19 pandemic, but the jail officials in those cases enacted far more comprehensive policies than those presented here. *See e.g. Harb v. Penzone*, Case No. CV-21-01032-PHX-MTL, 2022 WL 17177675, *12 (D. Ariz. Nov. 23, 2022) (Maricopa County Sheriff not deliberately indifferent where in March 2020 jail enacted policies that restricted visitors, reduced inmate populations, distributed masks and cleaning supplies to inmates, required staff and inmates to wear masks, instituted screening protocols for everyone entering the jail, etc.); *Brogan v. BRRJA*, Case No. 7:21-cv-00180, 2022 WL 875040, *5 (W.D. Va. Mar. 23, 2022) (similar provisions including masks, temperature checks, and testing); *Carpenter v. Thurston County*, Case No. 3:21-cv-05859-BJR-JRC, 2022 WL 3239754, *5 (W.D. Wash. June 13, 2022) (similar provisions including screenings, quarantines, face mask directives, social distancing, and enhanced cleaning). In this case, however, there are material disputes of fact as to whether the Sheriff was deliberately indifferent to the serious risks of harm given the minimal safety measures he undertook.

Further, Mr. Ball has produced evidence that multiple inmates were injured by the Sheriff's policies. *Helbachs Café LLC*, 46 F.4th at 530. One inmate tragically died, and over 100 inmates tested positive for COVID-19 shortly after his death.

Because there are material disputes of fact as to whether the Vigo County Sheriff's Department COVID-19 policies caused Mr. Ball to suffer a constitutional injury, summary judgment must be **denied** as to the official capacity claim against him.

## IV.
## Conclusion

For the foregoing reasons, Sheriff Plasse's motion for summary judgment, dkt. [26], is **granted** as to Mr. Ball's claims against him in his individual capacity and **denied** as to claims against him in his official capacity.

The Court reconsiders its denial of Mr. Ball's motion for assistance with recruiting counsel, dkt. 7, and finds it should be granted. The Court will attempt to recruit counsel to assist Mr. Ball through final judgment. The magistrate judge is asked to hold a settlement conference once counsel has been appointed.

**IT IS SO ORDERED.**

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

KEITH ALLEN BALL
109445
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

Magistrate Judge Dinsmore